**WO**

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Erica Williams, | No. CV-23-01076-PHX-DWL |
| Plaintiff, | **ORDER** |
| v. | |
| Experian Information Solutions Incorporated, | |
| Defendant. | |

Erica Williams ("Plaintiff") alleges that Experian Information Solutions, Inc. ("Defendant" or "Experian") violated the Fair Credit Reporting Act ("FCRA") by falsely stating, in a credit report produced to a non-party, that Plaintiff was deceased. (Doc. 1.) Defendant has, in turn, moved to compel arbitration. (Doc. 18.)

For the following reasons, the motion is granted, but only insofar as it seeks to compel arbitration pursuant to the April 2016 Arbitration Agreement.

## BACKGROUND

I.    Factual Background

On April 21, 2017, Plaintiff created "an online Experian account . . . for the purposes of monitoring [her] Experian credit report." (Doc. 18-1 ¶ 3; Doc. 19-1 ¶ 2.) Defendant "is a 'consumer reporting agency'" that "sells millions of consumer reports (often called 'credit reports' or 'reports') per day, and also sells credit scores." (Doc. 1 ¶¶ 16, 24.)

On March 17, 2023, Plaintiff received a letter from non-party Discover Financial

Services ("Discover") regarding a Discover account associated with Plaintiff ("Discover Account"). (*Id.* ¶ 63.) The letter stated that "'we are seeking payment from the assets of the deceased' to 'pay the outstanding balance' for the Discover Account." (*Id.* ¶ 64.)

On March 18, 2023, Plaintiff called Discover to pay the outstanding bill but "was informed by the representative at Discover that she could not pay the balance on her account because she was deceased." (*Id.* ¶¶ 65-66.)

On March 20, 2023, Plaintiff called Defendant and other non-party credit reporting agencies. (*Id.* ¶ 68.) Defendant informed Plaintiff "that they were reporting [her] as deceased but needed documentation and proof of life to correct it." (*Id.* ¶ 71.)

On March 21, 2023, Plaintiff "obtained a letter stating that she was not being reported as deceased by the Social Security Administration," "which she faxed to Discover the same day." (*Id.* ¶ 67.)

On March 31, 2023, "Plaintiff applied for a pre-approved Capital One credit card." (*Id.* ¶ 72.) "Given that [Defendant] was the only [c]redit reporting [a]gency reporting Plaintiff as deceased, due to their inaccurate reporting, Plaintiff was not approved for a Capital One credit card." (*Id.* ¶ 73.)

On April 18, 2023, Defendant stopped reporting Plaintiff as deceased. (*Id.* ¶ 71.)

On May 21, 2023, Plaintiff logged into her Experian account for the last time. (Doc. 18 at 6; Doc. 18-1 ¶ 5.)[1]

On May 22, 2023, Plaintiff cancelled her Experian account. (Doc. 18 at 6; Doc. 18-1 ¶ 5; Doc. 19 at 13 [acknowledging that Plaintiff "maintained an Experian account" for six years].)

…

…

---

[1]    Plaintiff does not seem to dispute that she last logged into her account on May 21, 2023, but rather challenges Defendant's recordkeeping: "If Experian's recordkeeping is so incredibly thorough that it tracked and recorded every login over the six years that Plaintiff maintained an Experian account, down [to] the date of the last such login, and can be used to determine how many times a particular email is opened by a consumer, how is it possible that Experian does not have contemporaneous records showing what [Plaintiff] actually did on April 21, 2017?" (Doc. 19 at 13.)

1   II.   Relevant Procedural History

2       On June 12, 2023, Plaintiff initiated this action by filing the complaint.  (Doc. 1.)

3       On December 18, 2023, Defendant moved to compel arbitration.  (Doc. 18.)

4       On January 2, 2024, Plaintiff filed an opposition.  (Doc. 19.)[2]

5       On January 9, 2024, Defendant filed a reply.  (Doc. 23.)

6       On January 12 and 16, 2024, Defendant filed notices of supplemental authority.

7   (Docs. 25, 27.)

8       On February 7, 2024, Defendant filed a motion to stay discovery pending the

9   resolution of the motion to compel arbitration.  (Doc. 30.)

10      On February 23, 2024, after full briefing (Docs. 32, 33), the Court granted

11  Defendant's stay request.  (Doc. 34.)

12      On May 5, 2024, Plaintiff filed a notice of supplemental authority.  (Doc. 35.)

13      On July 9, 2024, the Court issued a tentative ruling.  (Doc. 37.)

14      On July 23, 2024, Plaintiff and Defendant filed notices of supplemental authority

15  (Docs. 38, 39), and Defendant filed a response (Doc. 40).

16      On July 30, 2024, the Court heard oral argument.  (Doc. 41.)

17      On August 6, 2024, Plaintiff filed supplemental briefing as authorized by the Court

18  during oral argument.  (Doc. 42.)

19  III.   The Terms Of Use

20      Attached to Defendant's motion are four versions of the "terms of use" agreements

21  that were in effect while Plaintiff had an Experian account: (1) the April 5, 2016 terms of

22  use agreement ("April 2016 Terms of Use") (Doc. 18-4); (2) the January 8, 2019 terms of

23  use agreement ("January 2019 Terms of Use") (Doc. 18-7); (3) the February 2, 2023 terms

24  of use agreement ("February 2023 Terms of Use") (Doc. 18-5); and (4) the April 3, 2023

25  terms of use agreement ("April 2023 Terms of Use") (Doc. 18-6).[3]

26  _____

[2]      Also on January 2, 2024, Plaintiff filed a motion to exclude the declaration of Dan
27  Smith attached to Defendant's motion to compel arbitration.  (Doc. 20.)  However, Plaintiff
    later withdrew the motion to exclude while clarifying that she does not waive "her
28  evidentiary objections to the Declaration of Dan Smith."  (Doc. 26 at 2.)

[3]      The Court acknowledges there may have been additional versions of the terms of

A. **April 2016 Terms Of Use**

There are two parties to the April 2016 Terms of Use: (1) the customer, who is defined as "you" or "User"; and (2) Experian Consumer Services ("ECS").  (Doc. 18-4 at 2.)  The section entitled "Overview and Acceptance of Terms" includes the following definition of ECS:

> For purposes of this Agreement, the terms "we," "us" or "ECS" refer to ConsumerInfo.com, Inc., an Experian® company (also known as Experian Consumer Services), and referred to as "Experian" on the Websites, its predecessors in interest, successors and assigns, and any of its third party service providers (including, without limitation, cloud service providers) who ECS uses in connection with the provision of the Services to you.

(*Id.*, capitalization omitted.)

The section entitled "Amendments" provides as follows:

> This Agreement may be updated from time to time.  You should check this Website regularly for updates to this Agreement.  Each time you order, access or use any of the Services or Websites, you signify your acceptance and agreement, without limitation or qualification, to be bound by the then current Agreement.  Modifications take effect as soon as they are posted to this Website (or any of the Websites, to the extent applicable to you), delivered to you, or reasonably made available to you in writing by ECS.  However, no unilateral amendment will retroactively modify the parties' agreed-to dispute resolution provisions of this Agreement for then-pending disputes, unless the parties expressly agree otherwise in writing.  In all other respects, any modification or update to the arbitration provision shall be governed by subsection (g) of the Agreement's "Dispute Resolution By Binding Arbitration" Section below.

(*Id.*, capitalization omitted.)

The April 2016 Terms of Use also include an arbitration agreement ("April 2016 Arbitration Agreement").  (*Id.* at 3-4.)  As for the scope of the April 2016 Arbitration Agreement, § (a) provides as follows:

---

use in effect while Plaintiff had an Experian account.  This does not affect the analysis here.

ECS and you agree to arbitrate all disputes and claims between us arising out of this Agreement directly related to the Services or Websites, except any disputes or claims which under governing law are not subject to arbitration. This agreement to arbitrate is intended to be broadly interpreted and to make all disputes and claims between us directly relating to the provision of any Service and/or your use of any Website subject to arbitration to the fullest extent permitted by law. ***However, for the avoidance of doubt, any dispute you may have with us arising out of the Fair Credit Reporting Act (FCRA) relating to the information contained in your consumer disclosure or report, including but not limited to claims for alleged inaccuracies, shall not be governed by this agreement to arbitrate***. The agreement to arbitrate otherwise includes, but is not limited to: claims arising out of or relating to any aspect of the relationship between us arising out of any Service or Website, whether based in contract, tort, statute (including, without limitation, the Credit Repair Organizations Act) fraud, misrepresentation or any other legal theory, claims that arise before this or any prior Agreement (including, but not limited to, claims relating to advertising), claims that are currently the subject of purported class action litigation in which you are not a member of a certified class, and claims that may arise after the termination of this Agreement.

For the purposes of this arbitration provision, references to "ECS," "you," and "us" shall include our respective parent entities, subsidiaries, affiliates, agents, employees, predecessors in interest, successors and assigns, websites of the foregoing, as well as all authorized or unauthorized users or beneficiaries of Services and/or Websites. Notwithstanding the foregoing, either party may bring an individual action in small claims court. You agree that, by entering into this Agreement, you and ECS are each waiving the right to a trial by jury or to participate in a class action. This Agreement evidences a transaction in interstate commerce, and thus the Federal Arbitration Act governs the interpretation and enforcement of this arbitration provision. The arbitration provision shall survive termination of this Agreement.

(*Id.*, emphasis added.)

Section (c) of the April 2016 Arbitration Agreement further specifies, in relevant part, that:

The arbitration will be governed by the Commercial Dispute Resolution Procedures and the Supplementary Procedures for Consumer Related Disputes (collectively, "AAA Rules") of the American Arbitration Association ("AAA"), as modified by this Agreement, and will be administered by the AAA. . . . All issues are for the arbitrator to decide,

including the scope and enforceability of this arbitration provision as well as the Agreement's other terms and conditions, and the arbitrator shall have exclusive authority to resolve any such dispute relating to the scope and enforceability of this arbitration provision or any other term of this Agreement including, but not limited to any claim that all or any part of this arbitration provision or Agreement is void or voidable.

(*Id.* at 4.)

Section (g) of the April 2016 Arbitration Agreement provides customers with a right to opt out of modifications to the April 2016 Terms of Use:

Notwithstanding any provision in this Agreement to the contrary, we agree that if ECS makes any change to this arbitration provision (other than a change to the Notice Address) during your membership in any Service, including credit monitoring, or subsequent to your purchase of any Service, you may reject any such change and require ECS to adhere to the language in this provision as written at the time of your enrollment or purchase if a dispute between us arises regarding such Service.

(*Id.*)

B. **January 2019 Terms Of Use**

Like the April 2016 Terms of Use, the January 2019 Terms of Use also include an arbitration agreement ("January 2019 Arbitration Agreement").  (Doc. 18-7 at 5-6.)  The January 2019 Arbitration Agreement differs in a few ways from the April 2016 Arbitration Agreement.  The most significant change for present purposes is that the January 2019 Arbitration Agreement eliminates the carveout for FCRA claims that appears in the April 2016 Arbitration Agreement.   (*Compare* Doc. 18-4 at 3-4 [April 2016 Arbitration Agreement including the carveout language] *with* Doc. 18-7 at 5 [January 2019 Arbitration Agreement omitting the carveout language].)

C. **February 2023 Terms Of Use**

The parties to the February 2023 Terms of Use, like the April 2016 Terms of Use, are (1) the customer, who is defined as "you" or "User"; and (2)  ECS.  (Doc. 18-5 at 2.)

The February 2023 Terms of Use modify the definition of "ECS" in the "Overview and Acceptance of Terms" from the April 2016 Terms of Use as follows:

> The term "ECS" means ConsumerInfo.com, Inc., an Experian® company (also known as Experian Consumer Services) and referred to as "Experian" on the Websites, its predecessors in interest, successors and assigns, **affiliates (including, but not limited to, Experian Information Solution, Inc.), agents, employees**, and any of its third party service providers (including, without limitation, cloud service providers) who ECS uses in connection with the provision of the Services to you. The terms "we" and "us" mean you and ECS.

(*Id.*, emphasis added.)

The February 2023 Terms of Use incorporate the same "Amendments" language as the April 2016 Terms of Use. (*Id.* at 5.)

The February 2023 Terms of Use also include an arbitration agreement ("February 2023 Arbitration Agreement"). (*Id.* at 7-10.) The scope of the February 2023 Arbitration Agreement provides that:

> ECS and you agree to arbitrate all disputes and claims between us arising out of or relating to this Agreement to the maximum extent permitted by law, except any disputes or claims which under governing law are not subject to arbitration. This agreement to arbitrate is intended to be broadly interpreted and to make all disputes and claims between us directly relating to the provision of any Service and/or your use of any Website subject to arbitration to the fullest extent permitted by law. The agreement to arbitrate includes, but is not limited to: claims arising out of or relating to any aspect of the relationship between us arising out of any Service or Website, whether based in contract, tort, statute (including, without limitation, the Credit Repair Organizations Act) fraud, misrepresentation or any other legal theory; claims that arose before this or any prior Agreement (including, but not limited to, claims relating to advertising); claims that are currently the subject of purported class action litigation in which you are not a member of a certified class; and claims that may arise after the termination of this Agreement.
>
> For purposes of this arbitration provision, references to "ECS," "you," and "us" shall include our respective parent entities, subsidiaries, affiliates (including, without limitation, our service providers), agents, employees, predecessors in interest, successors and assigns, websites of the foregoing, as well as all authorized or unauthorized users or beneficiaries of Services and/or Websites or information under this or prior Agreements between us relating to Services and/or Websites. Notwithstanding the foregoing, either party may bring an individual action in small claims court. You agree that,

1
2
3
4
5

> by entering into this Agreement, you and ECS are each waiving the right to a trial by jury or to participate in a class action to the maximum extent permitted by law.  This Agreement evidences a transaction in interstate commerce, and thus the Federal Arbitration Act governs the interpretation and enforcement of this arbitration provision.  This arbitration provision shall survive termination of this Agreement.

6
7
8
9
10

(*Id.* at 8-9.)  The February 2023 Arbitration Agreement also includes the language from § (c) of the April 2016 Arbitration Agreement regarding the American Arbitration Association ("AAA") and the scope of issues reserved for the arbitrator to decide.  (Doc. 18-4 at 4 [April 2016 Arbitration Agreement]; Doc. 18-5 at 9 [February 2023 Arbitration Agreement].)

11
12
13

Section (g) of the February 2023 Arbitration Agreement incorporates the opt-out language from § (g) of the April 2016 Arbitration Agreement with one modification indicated in emphasized text below:

14
15
16
17
18
19

> Notwithstanding any provision in this Agreement to the contrary, we agree that if ECS makes any change to this arbitration provision (other than a change to the Notice Address) during your membership in any Service, including credit monitoring, or subsequent to your purchase of any Service, you may reject any such change and require ECS to adhere to the language in this provision as written at the time of your enrollment or purchase if a dispute between us arises regarding such Service ***by providing Notice to ECS at the Notice Address above prior to initiating your dispute***.

20

(Doc. 18-5 at 10, emphasis added.)

21

### D. **April 2023 Terms Of Use**

22
23
24

The April 2023 Terms of Use incorporate substantially the same definition of "ECS" in the "Overview and Acceptance of Terms" as the February 2023 Terms of Use.  (Doc. 18-6 at 2, capitalization omitted.)[4]

25
26

The April 2023 Terms of Use include the following language regarding

27
28

---

[4]     The only difference between the definitions in the February 2023 Terms of Use and April 2023 Terms of Use is one minor correction to add an "s" to "Solution" in Experian Information Solutions, Inc.  (*Compare* Doc. 18-6 at 2 [April 2023 Terms of Use] *with* Doc. 18-5 at 2 [February 2023 Terms of Use].)

"Amendments," slightly modified from the "Amendments" language in the April 2016 Terms of Use, January 2019 Terms of Use, and February 2023 Terms of Use:

> This Agreement may be updated from time to time. You should check this Website regularly for updates to this Agreement. Each time you order, access or use any of the Services or Websites, you signify your acceptance and agreement, without limitation or qualification, to be bound by the then current Agreement. Modifications take effect as soon as they are posted to this Website (or any of the Websites, to the extent applicable to you), delivered to you, or reasonably made available to you in writing by ECS. However, no amendment will retroactively modify the parties' agreed-to dispute resolution provisions of this Agreement for then-pending disputes, unless the parties expressly agree otherwise in writing.

(*Id.* at 6.)

The April 2023 Terms of Use include an arbitration agreement ("April 2023 Arbitration Agreement"), which includes the language from § (c) of the April 2016 Arbitration Agreement regarding the AAA but modifies the language regarding the scope of issues delegated to the arbitrator to decide, adding examples of issues the arbitrator can decide:

> All issues are for the arbitrator to decide including, but not limited to, (i) all issues regarding arbitrability, (ii) the scope and enforceability of this arbitration provision as well as the Agreement's other terms and conditions, (iii) whether you or ECS, through litigation conduct or otherwise, waived the right to arbitrate, (iv) whether all or any part of this arbitration provision or Agreement is unenforceable, void or voidable including, but not limited to, on grounds of unconscionability, (v) any dispute regarding the payment of arbitration-related fees, (vi) any dispute related to the dispute Notice provisions in subparagraph (b) (above), and (vii) any dispute related to Mass Arbitration (defined below).

(*Id.* at 11.)

The April 2023 Arbitration Agreement excludes the opt-out language in § (g) in the April 2016 Arbitration Agreement, January 2019 Arbitration Agreement, and February 2023 Arbitration Agreement. (*Compare* Doc. 18-6 at 12 [§ (g) in the April 2023 Arbitration Agreement] *with* Doc. 18-4 at 4 [§ (g) in the April 2016 Arbitration Agreement]

1   *and* Doc. 18-7 at 6 [§ (g) in the January 2019 Arbitration Agreement] *and* Doc. 18-5 at 10

2   [§ (g) in the February 2023 Arbitration Agreement].)  Instead, the April 2023 Terms of Use

3   include the following language in the section titled "Notice to Existing Customers":

> This Agreement modifies the prior version of the Terms of Use Agreement,
> which had an effective date of February 2, 2023 (the "Prior Version").  This
> Agreement shall take effect as soon as it is posted to the Website(s), and is
> binding on you.  A copy of this Agreement also is being e-mailed to you at
> the e-mail address currently on file with your membership.  Unless the parties
> agree in writing, the modifications to the dispute resolution provisions in the
> Prior Version as reflected in this Agreement shall not apply to any lawsuit
> currently pending in any court or in any arbitration currently pending before
> the AAA or any other arbitration provider.
>
> On or before June 1, 2023, you have the right to reject this Agreement by
> cancelling your membership.  If you elect to cancel your membership on or
> before June 1, 2023, in any subsequent proceeding in which ECS elects to
> initiate or compel arbitration against you, the dispute resolution provisions
> in the Prior Version shall control such proceeding.  If, however, you cancel
> your membership on or before June 1, 2023, but thereafter chose to initiate
> or compel an arbitration proceeding against ECS, the dispute resolution
> provisions in this Agreement shall govern such proceeding.

(Doc. 18-6 at 5-6, capitalization omitted.)

## DISCUSSION

I.   <u>Admissibility Of The Smith Declaration</u>

A.   **The Declaration**

Attached to Defendant's motion to compel arbitration is a declaration from Dan

Smith, the Director of Product Operations at ConsumerInfo.com, Inc. ("CIC"), which does

business as ECS.  (Doc. 18-1.)  In his declaration, Smith avows that Defendant is an affiliate

of ECS and that "CIC/ECS and [Defendant] are both wholly-owned subsidiaries of

Experian Holdings, Inc., and the parent company is Experian plc."  (*Id.* ¶ 2.)  Smith avows

that Defendant was an affiliate of ECS throughout the period in which Plaintiff had an

account.  (*Id.* ¶ 6.)  Smith also avows that Defendant "contributed to the services that

CreditWorks subscribers receive by providing regular access to how information appears

in [Defendant's] credit files, including changes to their credit file information.  Further, all

CreditWorks subscribers are required to provide written authorization under the FCRA to obtain their credit report and/or credit score(s) on a recurring basis from [Defendant] through CreditWorks." (*Id.* ¶ 8.)

Smith also avows that, "[b]ased upon [his] review of CIC's membership enrollment data maintained in the regular course of business, on April 21, 2017, Plaintiff enrolled in CreditWorks." (*Id.* ¶ 3.) Smith then describes the process that Plaintiff had to follow to enroll in CreditWorks, with reference to attached screenshots of the webpages Plaintiff would have seen. (*Id.*) According to Smith, "Plaintiff had to complete two webforms." (*Id.*; Doc. 18-2 [screenshot of first webform]; Doc. 18-3 [screenshot of second webform].) Smith avows that, on the first form, Plaintiff had to enter her personal information and click "Submit and Continue." (Doc. 18-1 ¶ 3; Doc. 18-2 at 2.) According to Smith, Plaintiff would have then been taken to a second form to provide additional personal information and create a username and password. (Doc. 18-1 ¶ 3; Doc. 18-3 at 2.) Smith avows that, to finish enrollment, Plaintiff had to click the "Submit Secure Order" button on this second page. (Doc. 18-1 ¶¶ 3, 5.) According to Smith and the attached screenshot, above that button was the following language: "By clicking 'Submit Secure Order': I accept and agree to your Terms of Use Agreement, as well as acknowledge receipt of your Privacy Policy and Ad Targeting Policy. . . . I understand that I may withdraw this authorization at any time by contacting ECS." (Doc. 18-3 at 2; 18-1 ¶ 3.) Smith further avows (and the screenshot shows) that the phrase "Terms of Use Agreement" was offset in blue text, and Smith avows that if Plaintiff would have clicked this text, she would have been presented with the full text of the "Terms of Use Agreement." (Doc. 18-1 ¶ 4.) Smith avows that Plaintiff clicked "Submit Secure Order" and enrolled in CreditWorks. (*Id.* ¶ 5.)

Smith asserts that when Plaintiff enrolled in CreditWorks, the April 2016 Terms of Use were in effect. (Doc. 18-1 ¶ 5; Doc. 18-4.) Smith avows that "[e]very version of the Terms of Use that was in effect during Plaintiff's enrollment in CreditWorks contains an Arbitration Agreement." (Doc. 18-1 ¶ 6.) Smith acknowledges that the April 2016 Arbitration Agreement includes a carveout to the scope of arbitration "exclud[ing] 'any

dispute between [Defendant] and Plaintiff arising out of the [FCRA] relating to the information contained in Plaintiff's consumer disclosure or report'" but notes that this carveout was deleted in the January 2019 Arbitration Agreement and has not been included in the arbitration agreements since then.  (*Id.* ¶ 8, cleaned up.)

Smith asserts that the February 2023 Terms of Use are applicable to Plaintiff's claim here.  (*Id.* at 4 n.1.)  In support, Smith states that each version of the terms of use has "a section entitled, 'Amendments,' which advised [Plaintiff] that she would be bound by the then-current Terms of Use each time she 'ordered, accessed, or used' any of the Services or Websites described in the agreement."  (*Id.* ¶ 7, cleaned up.)  Smith states that Plaintiff logged into CreditWorks for the last time on May 21, 2023 and deleted her account the following day.  (*Id.* ¶ 5.)  Smith avows that "[t]he Terms of Use that were in effect at the time Plaintiff cancelled her membership [were the April 2023 Terms of Use].  Those [t]erms, however, . . . provide that if Plaintiff cancelled or or [sic] before June 1, 2023, the version of the Terms of Use Agreement in effect immediately prior to the [April 2023 Terms of Use] would apply to her claims in any future dispute.  Given the timing of her cancellation, the [February 2023 Terms of Use]—which Plaintiff accepted by logging on and using the membership after those Terms took effect (on February 5, 2023)—thus apply to her claims."  (*Id.* at 4 n.1.)

B.   **Legal Standard**

"It is permissible to consider evidence outside the pleadings when resolving a motion to compel arbitration.  To the extent there are conflicts in the evidence submitted by the parties, the court applies a standard similar to that applicable for a motion for summary judgment."  *Scott-Ortiz v. CBRE Inc.*, 501 F. Supp. 3d 717, 721 (D. Ariz. 2020) (cleaned up).  For summary judgment purposes, "[a]n affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated."  Fed. R. Civ. P. 56(c)(4).

As for the personal knowledge requirement, "a witness has personal knowledge only

when testifying about events perceived through the physical senses or when testifying about opinions rationally based on personal observation and experience." *De La Torre v. Merck Enters., Inc.*, 540 F. Supp. 2d 1066, 1075 (D. Ariz. 2008).  Federal Rule of Evidence 602 provides that "[e]vidence to prove personal knowledge may consist of the witness's own testimony." *Id.*  "[A declarant's] belief . . . without evidence supporting that belief, is no more than speculation or unfounded accusation . . . .  It is not enough for a witness to tell all she knows; she must know all she tells."  *Carmen v. S.F. Unified Sch. Dist.*, 237 F.3d 1026, 2018 (9th Cir. 2010).  "[C]onclusory affidavits fail to establish foundation." *Travelers Cas. & Sur. Co. of Am. v. Telstar Constr. Co.*, 252 F. Supp. 2d 917, 924 (D. Ariz. 2003).

### C.     The Parties' Arguments

Plaintiff argues that "[t]he sole piece of evidence proffered by [Defendant] to satisfy its burden of proving formation of an agreement to arbitrate is that of a declaration signed by Smith," which "fails to counter the Plaintiff's vehement dispute that she never saw— much less assented to—any agreement to strip her rights to a federal jury trial here."  (Doc. 19 at 6-7.)   Plaintiff argues that "the statements in the declaration from Smith are inadmissible for want of Smith's personal knowledge, and therefore cannot support Experian's assertion of valid formation of an agreement to arbitrate." (*Id.* at 14.)  Plaintiff also argues, in reliance on *Austin v. Equifax Information Services, LLC*, 2023 WL 8646275 (E.D. Va. 2023), that Smith's declaration should be excluded because Smith did not specify the documents on which he relied and Defendant did not produce the documents when requested.  (Doc. 19 at 10-14.)

Defendant replies that Smith's declaration satisfies the personal knowledge requirement.  (Doc. 23 at 4-7.)  Defendant contends that "[n]one of Plaintiff's specific objections to [Smith's] declaration ha[ve] merit" because Smith did not need to be "physically present in the room with [Plaintiff] when she enrolled" in CreditWorks; because Smith's knowledge can be inferred from his position; and because Smith's personal knowledge comes from CIC's business records and his job duties.  (*Id.* at 7-10.)

Defendant describes *Austin* as "an outlier—at odds with (1) decisions in its own district, (2) Ninth and Fourth Circuit precedent instructing that personal knowledge of corporate declarants is presumed, and (3) decisions from courts upholding the same declarant's declaration" and also seeks to distinguish *Austin* based on procedural history.  (*Id.* at 10-14, cleaned up.)[5]

### D.    **Analysis**

In the Ninth Circuit, "[p]ersonal knowledge may be inferred from a declarant's position."  *In re Kaypro*, 218 F.3d 1070, 1075 (9th Cir. 2000).  Smith has been the Director of Product Operations for CIC since January 2010.  (Doc. 18-1 ¶ 1.)  In that role, Smith's duties include "supporting the consumer enrollment process into CreditWorks and related services," which requires that he be "familiar with . . . how consumers enroll, the forms they must complete to enroll, as well as the Terms of Use governing such services" and "the webpages a consumer would have encountered to complete their enrollment into CreditWorks, the personally identifiable information entered when enrolling, which links or buttons the consumer clicked on, and date and time of the consumer's acceptance of the Terms of Use."  (*Id.*)  Smith states that his duties also require him to be "familiar with Experian's internal records that document consumers' ongoing use of their CreditWorks account, including when a consumer logs into their account or changes their account information, as well as any time a consumer receives an email or alert through their Credit[W]orks membership."  (*Id.*)

Smith's job title and description of his duties are sufficient to establish his personal knowledge of the steps a customer must take (and the webpages a customer must encounter) when signing up for a CreditWorks account.  *Johnson v. Sw. Recovery Servs. Inc.*, 2023 WL 1944127, *3 (N.D. Tex. 2023), *report and recommendation adopted,* 2023

---

[5]    Defendant also disputes Plaintiff's contention that it refused to produce documents: "In every case in which counsel has requested documentation that the plaintiff was a CreditWorks member, [Defendant] and every other Experian affiliate has provided the date of enrollment, the relevant webform that was used to enroll, the Terms of Use in effect at enrollment, and the applicable Terms of Use (based upon the timing of a particular consumer's use of the service)."  (*Id.* at 16-17, capitalization omitted.)

WL 1879999 (N.D. Tex. 2023) ("Based on his position with CIC and his familiarity with the details of the case, Williams has the requisite personal knowledge to make the statements at issue."); *S.S. by and through Stern v. Peloton Interactive, Inc.*, 566 F. Supp. 3d 1019, 1046 (S.D. Cal. 2021) ("Plaintiffs argue Mr. Feinberg failed to lay a proper foundation . . . [because] Mr. Feinberg has disclosed nothing that suggests he has personal knowledge regarding Mr. Stern's purported acceptance of the Terms of Service.  However, Mr. Feinberg's two declarations establish that (1) he has personal knowledge as to when Mr. Stern registered for a Peloton account; (2) when users undertake a registration, they must accept Peloton's Terms of Service; and (3) Peloton maintains users' account information related to that process, including whether they accepted the required legal agreements. Thus, Plaintiffs' objection that Mr. Feinberg failed to lay a proper foundation is also OVERRULED.") (cleaned up); *Grice v. Uber Techs., Inc.*, 2020 WL 497487, *9 (C.D. Cal. 2020) ("Gabriel's and McKelvy's statements are based on their personal knowledge and experience of the registration process for the Uber App as a senior software engineer and product manager at Uber, respectively.").  Although Smith does not work for CreditWorks or Defendant, his duties demonstrate how he acquired personal knowledge of the CreditWorks sign-up process and Defendant's internal records.  *Compare Dillon v. BMO Harris Bank, N.A.*, 173 F. Supp. 3d 258, 266-68 (M.D.N.C. 2016), *dismissed sub nom. Dillon v. Bay Cities Bank*, 2017 WL 11773670 (4th Cir. 2017) ("He does not identify his position with AMG and says nothing about how his work related to USFastCash's online lending procedures.  He does not affirm he worked for AMG at any relevant time. . . .  Here, Mr. Muir does not establish how he acquired personal knowledge about the business practices of an entity that did not employ him . . . .") (citations omitted).

Plaintiff's arguments to the contrary are unavailing.  As an initial matter, those arguments often rest on mischaracterizations of Smith's statements.  For example, Plaintiff argues that Smith cannot demonstrate personal knowledge by relying on "unknown and unnamed documents" that were never provided to her (Doc. 19 at 8), but Smith's declaration *does* identify (albeit somewhat generically) the documents he reviewed: "The

facts stated in this Declaration are of my own personal knowledge, including knowledge acquired in the course and scope of my job responsibilities and through the review of pertinent documents maintained as business records by CIC in the course and scope of CIC's business, including Experian's internal records that store CreditWorks account information." (Doc. 18-1 ¶ 1.)  Plaintiff also argues that Smith cannot establish personal knowledge through an ambiguous assertion that he gained knowledge "in the course and scope of his job responsibilities and through the review of documents" (Doc. 19 at 9, cleaned up), but Smith's description of his job responsibilities outlined above is far from ambiguous.

Further, Plaintiff's argument that "the admissibility of an affidavit demands adherence to stringent criteria" (*id.* at 7) overstates the difficulty of establishing personal knowledge.  "[T]he requirement of personal knowledge imposes only a 'minimal' burden on a witness."  *Strong v. Valdez Fine Foods*, 724 F.3d 1042, 1045 (9th Cir. 2013).  Similarly, Plaintiff's argument that Smith lacks personal knowledge because he "never establishes that he has ever viewed any consumer visiting the unknown website at any point," was not present with customers when they accessed the webpages, and "does not know Plaintiff" (Doc. 19 at 9-10) imposes a far greater burden for personal knowledge than what is required.  Equally unpersuasive is Plaintiff's argument (*id.* at 8) that "Smith's position does not and cannot validate what appeared on Plaintiff's unknown electronic device . . . when Plaintiff allegedly signed up for a CreditWorks account."  *Melo v. Zumper, Inc.*, 439 F. Supp. 3d 683, 694 (E.D. Va. 2020) ("Courts across the country, facing issues of e-commerce contracts, have regularly and properly relied on these types of records and have consistently allowed testimony by those with personal knowledge about what 'would have appeared' on a user's screen.") (collecting cases); *Mancilla v. ABM Indus., Inc.*, 2020 WL 4432122, *6 (S.D.N.Y. 2020) ("[W]hen presented with arbitration agreements in contracts formed online between companies and their customers—or, as in this case, between employers and their employees—courts routinely rely on affidavits and declarations (similar to the Rawlins Declaration) describing and depicting how the affected

individual manifested assent to the company's arbitration provision."). The bottom line is that Smith's declaration is sufficient to establish his personal knowledge of the matters he describes. *See also Myers v. Experian Info. Sols. Inc.*, 2024 WL 2278398, *3 (D. Ariz. 2024) (reaching the same conclusion regarding Smith's declaration in similar case); *Johnson*, 2023 WL 1944127 at *3 (reaching the same conclusion regarding another CIC employee's declaration); *Salazar v. Experian Info. Sols., Inc.*, 2023 WL 3529635, *3-5 (W.D. Mo. 2023) (same).

*Austin* is not to the contrary. There, the court evaluated the sufficiency of a declaration from a different CIC employee, David Williams, when ruling on a motion to compel arbitration. *Austin*, 2023 WL 8646275 at *2-4. Williams's declaration only stated that he was "familiar with, among other things, the marketing, advertising and sales of CIC consumer credit products, including services that consumer[s] enroll in at Experian websites, as well as the Terms of Use governing such services." *Id.* at *4. The court concluded that "Williams' job description was too ambiguous to present a finding that Williams had personal knowledge of the averments in the Williams Affidavit. . . . In other words, Williams' actual job description in CIC did not permit a finding that he had personal knowledge of the Credit[W]orks sign-on process." *Id.* at *4. But here, Smith's declaration provides a much more detailed description of his job duties and understanding of the enrollment process.

For similar reasons, this case is distinguishable from *Lamonaco v. Experian Information Solutions, Inc.*, 2024 WL 1703112 (M.D. Fla. 2024). There, the court concluded that "Williams lacks personal knowledge that Lamonaco herself completed the enrollment process for CreditCheck Total at all." *Id.* at *4-5. In reaching this conclusion, the court emphasized that "[i]n each of the numerous cases Experian cites, unlike in this one, the plaintiff had to admit to accessing the defendant's website or to signing up for an account in order to bring the cause of action." *Id.* at *5. Here, Plaintiff acknowledges that she "had an online Experian account since in or around 2017." (Doc. 19-1 ¶ 2.)[6]

---

[6]    *Dillon v. BMO Harris Bank, N.A.*, 173 F. Supp. 3d 258 (M.D.N.C. 2016) is also distinguishable. There, the court explained that "[t]here are reasons to be wary of Mr.

1    II.    Motion To Compel Arbitration

2          A.    **Legal Standard**

3          The Federal Arbitration Act ("FAA") applies to contracts "evidencing a transaction

4   involving commerce."  9 U.S.C. § 2.  Under the FAA, written agreements to arbitrate

5   disputes "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at

6   law or in equity for the revocation of any contract."  *Id.*  Thus, absent a valid contractual

7   defense, the FAA "leaves no place for the exercise of discretion by a district court, but

8   instead mandates that district courts shall direct the parties to proceed to arbitration on

9   issues as to which an arbitration agreement has been signed."  *Dean Witter Reynolds, Inc.*

10  *v. Byrd,* 470 U.S. 213, 218 (1985).

11         In general, a district court's role under the FAA is "limited to determining

12  (1) whether a valid agreement to arbitrate exists and, if it does, (2) whether the agreement

13  encompasses the dispute at issue."  *Chiron Corp. v. Ortho Diagnostic Sys., Inc.*, 207 F.3d

14  1126, 1130 (9th Cir. 2000).  These two issues are sometimes referred to as the "gateway"

15  questions of arbitrability.  *Rent-A-Center, W., Inc. v. Jackson*, 561 U.S. 63, 68-69 (2010).

16         As the party seeking to compel arbitration, Defendant bears the burden of proof.

17  *Ashbey v. Archstone Property Mgmt., Inc.*, 785 F.3d 1320, 1323 (9th Cir. 2015).  As noted,

18  "[i]t is permissible to consider evidence outside the pleadings when resolving a motion to

19  compel arbitration.  To the extent there are conflicts in the evidence submitted by the

20  parties, the court applies a standard similar to that applicable for a motion for summary

21  judgment."  *Scott-Ortiz.*, 501 F. Supp. 3d at 721 (cleaned up).

22         "In determining whether parties have agreed to arbitrate a dispute, we apply general

23  state-law principles of contract interpretation, while giving due regard to the federal policy

24  in favor of arbitration by resolving ambiguities as to the scope of arbitration in favor of

25  arbitration."  *Mundi v. Union Sec. Life Ins. Co.*, 555 F.3d 1042, 1044 (9th Cir. 2009)

26  (cleaned up); *Davis v. Nordstrom, Inc.*, 755 F.3d 1089, 1093 (9th Cir. 2014).  Here, the

27

28  Muir's declaration" in part because he would not participate in a deposition.  *Id.* at 265.
    Plaintiff does not argue that Smith refused to participate in a deposition.

parties agree that Arizona law applies.  (Doc. 18 at 13-14; Doc. 19 at 5.)

B.      **Overview Of The Parties' Arguments**

Defendant argues that Plaintiff agreed to be bound by the April 2016 Terms of Use; that the February 2023 Terms of Use apply to Plaintiff's claim; that Defendant can enforce the February 2023 Terms of Use as an affiliate of ECS, or, in the alternative, as a third-party beneficiary; and that the February 2023 Arbitration Agreement delegates "all questions regarding arbitrability, enforceability and scope" to an arbitrator.  (Doc. 18 at 4, 8-15.)  Defendant also argues that "[t]here is a presumption in favor of arbitrability, and the party seeking to evade arbitration bears the burden of showing that the arbitration provision is invalid or does not encompass the claims at issue."  (*Id.* at 8, internal citation omitted.)

The bulk of Plaintiff's response questions the admissibility of the Smith declaration.  (Doc. 19 at 6-14.)  Plaintiff dedicates relatively little of her brief to her fallback argument, which is that "in the alternative, the sign-up process described in Smith's declaration is facially insufficient for a showing of mutual assent in the Ninth Circuit, a fundamental requirement for a finding of contract formation."  (*Id.* at 1.)  Elsewhere, Plaintiff elaborates that "the clickwrap agreement described [in Smith's declaration] is insufficient to establish mutual assent from users in the Ninth Circuit or under the laws of Arizona" and that "there cannot be a finding of mutual assent to the terms of the arbitration agreement Experian seeks to enforce here."  (*Id.* at 15, 18.)

In reply, Defendant argues that "Plaintiff does not challenge the enforceability of the arbitration agreement or delegation clause.  Thus, the Court's task in resolving this motion is limited to answering whether there is a valid agreement to arbitrate."  (Doc. 23 at 1.)  Defendant then seeks to distinguish Plaintiff's cited cases and elaborates upon some of the arguments regarding the validity of the April 2016 Terms of Use raised in its motion.  (*Id.* at 2-3, 10-16.)

C.      **Threshold Consideration: Delegation Of Gateway Questions**

As noted, a district court's role under the FAA is "limited to determining

(1) whether a valid agreement to arbitrate exists and, if it does, (2) whether the agreement encompasses the dispute at issue." *Chiron Corp.*, 207 F.3d at 1130.  Although these questions are ordinarily resolved by the court, parties may agree to arbitrate one or both of the gateway issues by including a delegation clause in the arbitration agreement: "An agreement to arbitrate a gateway issue is simply an additional, antecedent agreement the party seeking arbitration asks the federal court to enforce, and the FAA operates on this additional arbitration agreement just as it does on any other." *Rent-A-Center*, 561 U.S. at 70.  The evidence of the parties' intent to delegate such issues to the arbitrator must be "clear and unmistakable." *Brennan v. Opus Bank*, 796 F.3d 1125, 1130 (9th Cir. 2015).

Here, although Defendant contends (and Plaintiff does not seem to dispute) that the relevant arbitration agreements include clauses that delegate both gateway questions to the arbitrator,[7] Defendant also acknowledges that, despite the presence of these clauses, the Court still must resolve "whether there is a valid agreement to arbitrate between Plaintiff and [Defendant]."  (Doc. 23 at 1.)  The Court agrees that, despite the presence of the delegation clauses, it must resolve any disputes over contract formation.  *See, e.g., Caremark, LLC v. Chickasaw Nation*, 43 F.4th 1021, 1030 (9th Cir. 2022) ("[C]ontract-formation issues are always matters for judicial resolution . . . even in the presence of a delegation clause.  That principle follows from the fundamental premise that arbitration is strictly a matter of consent.  To take the question of contract formation away from the courts would essentially force parties into arbitration when the parties dispute whether they ever consented to arbitrate anything in the first place. . . .  The following principles emerge from the above line of cases.  First, a court must resolve any challenge that an agreement to arbitrate was never formed, even in the presence of a delegation clause.  Next, a court must also resolve any challenge directed specifically to the enforceability of the delegation clause before compelling arbitration of any remaining gateway issues of arbitrability.

---

[7]     *See, e.g.*, Doc. 18 at 4 ("The Arbitration Agreement in the CreditWorks Terms of Use delegates 'all issues' to an arbitrator—including all questions regarding arbitrability, enforceability and scope.  The contract also expressly incorporates the AAA rules.  Thus, if there is any dispute as to the arbitrability of Plaintiff's claims, an arbitrator is to resolve such issues.").

1    Finally, if the parties did form an agreement to arbitrate containing an enforceable

2    delegation clause, all arguments going to the scope or enforceability of the arbitration

3    provision are for the arbitrator to decide in the first instance.") (cleaned up).  Accordingly,

4    the Court limits its analysis to the contract-formation issues raised by the parties' briefing.[8]

5        D.    **April 2016 Terms Of Use**

6        As noted, Plaintiff's primary contract-formation argument is that "the sign-up

7    process described in Smith's declaration is facially insufficient for a showing of mutual

8    assent," which is "a fundamental requirement for a finding of contract formation."  (Doc.

9    19 at 1.)  The Court construes this as a challenge to whether Plaintiff agreed to be bound

10   by the terms of use that were applicable when she opened her Experian account in 2017

11   (*i.e.*, the April 2016 Terms of Use).

12       "For an enforceable contract to exist, there must be 'an offer, acceptance,

13   consideration, a sufficiently specific statement of the parties' obligations, and mutual

14   assent.'"  *Buckholtz v. Buckholtz*, 435 P.3d 1032, 1035 (Ariz. Ct. App. 2019) (citation

15   omitted).  Mutual assent must be "based on objective evidence, not on the hidden intent of

16   the parties."  *Hill-Shafer P'ship v. Chilson Fam. Tr.*, 799 P.2d 810, 815 (Ariz. 1990).

17   Objective evidence can include "written or spoken word or . . . conduct."  *Nguyen v. Barnes

18   & Noble Inc.*, 763 F.3d 1171, 1175 (9th Cir. 2014).  "These principles apply with no less

19   vigor to formation of arbitration contracts."  *Silva v. Butori Corp.*, 2020 WL 2308528, *4

20   (D. Ariz. 2020).

21       Internet contracts "come primarily in two flavors:" (1) clickwrap agreements "in

22   which website users are required to click on an 'I agree' box after being presented with a

23   list of terms and conditions of use;" and (2) browsewrap agreements "where a website's

24   terms and conditions of use are generally posted on the website via a hyperlink at the

25   bottom of the screen."  *Nguyen*, 763 F.3d at 1175-76.  "Often websites present some hybrid

26   of the two, such as putting a link to the terms of the agreement on the page, sometimes near

27

28   ---
     [8]    Because Plaintiff does not raise any challenges directed specifically to the enforceability of the delegation clauses, the analysis here is limited to *Caremark*'s first step.

a button the user must click to continue." *Berman v. Freedom Fin. Network, LLC*, 2020 WL 5210912, *2 (N.D. Cal. 2020).  Courts evaluating webpage designs similar to the design at issue here (*i.e.*, a webpage that requires a customer to click on a button to complete a transaction and notifies customers that by clicking the button, they assent to certain terms) have characterized them as hybrid agreements.  *Myers*, 2024 WL 2278398 at *4 n.2; *Capps v. JPMorgan Chase Bank, N.A.*, 2023 WL 3030990, *3-4 (E.D. Cal. 2023); *DeVries v. Experian Info. Sols., Inc.*, 2017 WL 733096, *5 (N.D. Cal. 2017).

For internet contracts, courts "have devised rules to determine whether meaningful assent has been given.  Unless the website operator can show that a consumer has actual knowledge of the agreement, an enforceable contract will be found based on an inquiry notice theory only if: (1) the website provides reasonably conspicuous notice of the terms to which the consumer will be bound; and (2) the consumer takes some action, such as clicking a button or checking a box, that unambiguously manifests his or her assent to those terms."  *Berman v. Freedom Fin. Network, LLC*, 30 F.4th 849, 856 (9th Cir. 2022).[9]

Defendant contends that "Plaintiff agreed to the [April 2016] Terms of Use Agreement because: (1) she had clear notice of the Terms of Use at the time she enrolled, (2) she was admonished that, by clicking an adjacent button, she was agreeing to be bound by the Terms of Use; and (3) she clicked the button, thereby manifesting [her] assent to the Terms of Use." (Doc. 18 at 9.)  In response, Plaintiff argues that the webpage did not "put users on notice of the terms to which they wish to bind consumers" and "[w]ithout such notice, there cannot be a finding of mutual assent to the terms of the arbitration agreement [Defendant] seeks to enforce here." (Doc. 19 at 18.)  Plaintiff further argues, in reliance on *Sgouros v. TransUnion Corp.*, 817 F.3d 1029 (7th Cir. 2016), that "nothing required the consumer to first click on the box containing the arbitration agreement, nor to scroll down

---

[9]    Although *Berman* addressed the requirements for proving assent under California and New York law, its analysis is equally instructive here because those states, like Arizona, apply the rule that "[p]arties traditionally manifest assent by written or spoken word, but they can also do so through conduct." *Id.* at 855.  *See generally Myers*, 2024 WL 2278398 at *3-5 (applying *Berman* when deciding whether assent existed under Arizona law); *Tate v. Progress Residential LLC*, 2024 WL 551979, *4 (D. Ariz. 2024) (same).

to view the complete contents of the same, nor did the sign-up process call the consumer's attention to any arbitration agreement." (*Id.* at 16.)  In reply, Defendant contends that "Plaintiff's declaration attesting that she was 'unaware,' 'did not see,' or does not 'recall' falls far short of an unequivocal denial—*i.e.*, I never entered into any agreement with [Defendant]—to create an issue of fact on the question of contract formation." (Doc. 23 at 3, cleaned up.)  Defendant also contends that "*Sgouros* is facially inapposite" because "[t]here was no mention of any contract, much less a hyperlink to the terms, in the enrollment screen at issue in *Sgouros*, which were the dispositive facts . . . in the case." (*Id.* at 2, 14-16.)

### 1.    Reasonably Conspicuous Notice

As for the first factor, "to be conspicuous in this context, a notice must be displayed in a font size and format such that the court can fairly assume that a reasonably prudent Internet user would have seen it." *Berman*, 30 F.4th at 856-57.

Defendant provided, as an attachment to Smith's declaration, the final page that Plaintiff would have encountered before creating her account. (Doc. 18-3.)  Directly above the "Submit Secure Order" button is a conspicuously displayed notice that "By clicking 'Submit Secure Order': I accept and agree to your Terms of Use Agreement." (*Id.* at 2.)  The phrase "Terms of Use Agreement" was offset from the rest of the text in blue, against a white background, and hyperlinked, as displayed below:



(*Id.*)

The Court concludes, consistent with the conclusions reached by other courts evaluating the same webpage, that the webpage design provided reasonably conspicuous notice of the April 2016 Terms of Use. *Myers*, 2024 WL 2278398 at *4 (concluding that the "website design provides constructive notice of the Terms of Use Agreement"); *Saucedo v. Experian Info. Sols., Inc.*, 2023 WL 4708015, *5 (E.D. Cal. 2023) (same); *Capps*, 2023 WL 3030990 at *4 (same); *DeVries*, 2017 WL 733096 at *5-6 (same); *Rodriguez v. Experian Servs. Corp.*, 2015 WL 12656919, *2 (C.D. Cal. 2015) (same); *Cimillo v. Experian Info. Sols., Inc.*, 2023 WL 2473403, *6 (S.D.N.Y. 2023) (same); *Solis v. Am. Express Nat'l Bank*, 2023 WL 4474322, *3 (M.D. Fla. 2023), *report and recommendation adopted,* 2023 WL 4831307 (M.D. Fla. 2023) (same).

*Sgouros* is not to the contrary. There, the court concluded that the defendant's webpage did not provide constructive notice that the plaintiff was bound by a terms of use agreement or arbitration clause. *Sgouros*, 817 F.3d at 1035-36. The court explained that "the web pages on which Sgouros completed his purchase contained no clear statement that his purchase was subject to any terms and conditions of sale. The scroll box contained the visible words 'Service Agreement' but said nothing about what the agreement regulated. The hyperlinked version of the Service Agreement was not labeled 'Terms of Use' or 'Purchase' or 'Service Agreement,' but rather just 'Printable Version.' And even indulging in the assumption that all visitors to this website are capable of reading the half-line of text, the visible words 'This Service Agreement contains the terms and conditions upon which you may access and use' fall short of providing notice that the purchase of a consumer credit score is subject to the agreement." *Id.* at 1035 (cleaned up). The court further noted that "what cinches the case for Sgouros is the fact that TransUnion's site actively misleads the customer. The block of bold text below the scroll box told the user that clicking on the box constituted his authorization for TransUnion to obtain his personal information. It says nothing about contractual terms. No reasonable person would think that hidden within that disclosure was also the message that the same click constituted acceptance of the Service Agreement." *Id.*

1     This case is distinguishable for several reasons.  The CreditWorks sign-up screen

2  did not contain a scroll box with hidden terms of use like that in *Sgouros*, but rather

3  displayed a paragraph clearly identifying a link to the "Terms of Use" in blue, hyperlinked

4  font.  (Doc. 18-3 at 2.)  Further, the paragraph was directly above the "Submit Secure

5  Order" button and the first sentence of the paragraph clearly notified Plaintiff that "[b]y

6  clicking 'Submit Secure Order': I accept and agree to your Terms of Use Agreement." (*Id.*)

7              2.      Unambiguous Manifestation Of Assent

8     As for the second factor, "[a] user's click of a button can be construed as an

9  unambiguous manifestation of assent only if the user is explicitly advised that the act of

10  clicking will constitute assent to the terms and conditions of an agreement."  *Berman*, 30

11  F.4th at 857.  "[T]he notice must explicitly notify a user of the legal significance of the

12  action she must take to enter into a contractual agreement."  *Id.* at 858.

13     Here, Plaintiff does not dispute that she signed up for "an online Experian account"

14  in 2017 "for the purposes of monitoring my Experian credit report"—a service provided

15  through CreditWorks.  (Doc. 19 at 13; Doc. 19-1 ¶ 2.)  *Ferrell v. to AppFolio, Inc.*, 2024

16  WL 158103, *2 (C.D. Cal. 2024) ("Ferrell admits that she 'signed up for an online Experian

17  account,' thereby enrolling for membership in ECS's product, 'CreditWorks.'") (footnote

18  omitted).  As the Smith declaration establishes, to create that account, Plaintiff had to click

19  "Submit Secure Order" and directly above that button, Plaintiff would have been notified

20  that by clicking "Submit Secure Order," she was agreeing to the "Terms of Use."  (Doc.

21  18-3.)  Plaintiff's assertions in her declaration that she "*did not see* an arbitration

22  agreement, or any mention of an arbitration agreement, when [she] signed up for [her]

23  online Experian account"; "*was not aware* of Experian's claim that when [she] signed up

24  for an online Experian account, [she] agreed to arbitrate any claims against Experian"; and

25  "did not click anything that [she] *recall[s]* indicating that [she] would be waiving [her]

26  right to a jury" (Doc. 19-1 ¶¶ 4-6, emphases added) fail to create a dispute of fact on this

27  point or otherwise demonstrate a lack of assent to the April 2016 Terms of Use.  *Myers*,

28  2024 WL 2278398 at *5 ("Plaintiff may not remember agreeing to the Arbitration

Agreement, but Plaintiff does not contest that she has an account with CreditWorks.  She also does not contest that users of CreditWorks must agree to the Terms of Use Agreement when creating their account.") (citation omitted); *Whalen v. Facebook, Inc.*, 2022 WL 19934419, *3 (N.D. Cal. 2022)  (plaintiffs' statements that they "don't recall" and "don't remember" seeing the in-app notification alerting them to the updated terms of use were "not sufficient to create a disputed fact"); *Grice*, 2020 WL 497487 at *11 ("Plaintiff's contention that he does not remember the opt-out option does not controvert Uber's evidence to create a genuine issue of disputed fact as to whether Plaintiff agreed to the arbitration provision."); *Cimillo*, 2023 WL 2473403 at *3, 6 ("Although plaintiff agrees she 'signed up with Experian online to receive free credit reports,' she allegedly does not recall signing up for CreditWorks, using CreditWorks, seeing the Arbitration Agreement, or entering into the Arbitration Agreement. . . .  While it may be true that plaintiff does not remember signing up for CreditWorks, 'it does not create an issue of fact as to whether she assented to the contract's terms.'  And, plaintiff's contention 'that she does not recall seeing' the Arbitration Agreement 'is insufficient to create a genuine issue of material fact as to whether the parties entered into" the Arbitration Agreement.'") (citations omitted); *Johnson*, 2023 WL 1944127 at *9 ("The evidence also shows that Plaintiff could not complete enrollment without assenting to the 2022 TOU Agreement by clicking the button on the webform. . . .  Plaintiff does not expressly deny clicking the button on the webforms or enrolling in an ECS membership.  Other than her bare sworn denial, she provides no contrary evidence sufficient to put the existence of an agreement 'in issue.'") (citation omitted); *Flores v. Chime Fin., Inc.*, 2022 WL 873252, *5 (S.D.N.Y. 2022) ("Plaintiff does not dispute that she successfully created a Chime account, which required her to agree to the terms.  Rather, she alleges that she 'does not recall which screens were displayed during the Chime accounts sign up process.'  While that may be true, it does not create an issue of fact as to whether she assented to the contract's terms.") (cleaned up).  *See also Blau v. AT&T Mobility*, 2012 WL 10546, *4 (N.D. Cal. 2012) ("If a party could get out of a contract by arguing that he did not recall making it, contracts would be meaningless.").

3.      Conclusion As To April 2016 Terms Of Use

Plaintiff validly manifested assent to be bound by the April 2016 Terms of Use, and therefore the April 2016 Arbitration Agreement, by clicking the "Submit Secure Order" button and creating an account.  *See also Oberstein v. Live Nation Ent., Inc.*, 60 F.4th 505, 516 (9th Cir. 2023) ("The language 'By continuing past this page and clicking the button, you agree to our Terms of Use' clearly denotes 'that continued use will act as a manifestation of the user's intent to be bound.'"); *Myers*, 2024 WL 2278398 at *5 (concluding that the plaintiff unambiguously manifested assent to the CreditWorks terms of use because plaintiff acknowledged that she had an account with CreditWorks); *Ferrell*, 2024 WL 158103 at *2 (same); *Capps*, 2023 WL 3030990 at *5 ("[T]he court finds that the website provided sufficient notice of the Terms of Use Agreement, and therefore that there was a binding arbitration agreement between plaintiffs and ECS."); *Saucedo*, 2023 WL 4708015 at *5-6 (same).

E.      **February 2023 Terms Of Use**

1.      Threshold Consideration

Defendant has not always taken consistent positions concerning which version of the arbitration agreement provides the foundation for its request to compel arbitration.  In its motion, Defendant asserts in a footnote that "the Terms of Use Agreement that went into effect [on] February 2, 2023 . . . apply to [Plaintiff's] claims."  (Doc. 18 at 6 n.1.)[10] However, in other places in its motion, Defendant more broadly argues that the Court should compel arbitration pursuant to "*the* arbitration agreement in the Terms of Use Agreement" (Doc. 18 at 8, emphasis added), without specifying which version of the arbitration agreement should be deemed applicable.

In the tentative ruling issued before oral argument, the Court stated that it construed Defendant's motion as seeking to compel arbitration pursuant to the February 2023 Arbitration Agreement and then concluded that, because Defendant had failed to come

---

[10]     Presumably, Defendant seeks to rely on the February 2023 Arbitration Agreement because it eliminates the carveout for FCRA claims that appeared in the April 2016 Arbitration Agreement.

forward with sufficient evidence to establish that the February 2023 contract-modification attempt was valid, Defendant's motion should be denied.  (Doc. 37 at 30-36.)  During oral argument, Defendant urged the Court to revisit this analysis for two reasons.  First, Defendant argued that because the April 2016 Arbitration Agreement (which the tentative ruling, like this order, found was properly formed under *Caremark*'s first step) contains a delegation clause, any remaining questions—including whether the April 2016 Arbitration Agreement was subsequently modified—are delegated to the arbitrator.  Second, and alternatively, Defendant clarified that it is seeking to compel arbitration pursuant to the April 2016 Arbitration Agreement even if the Court disagrees with its first argument and concludes that the February 2023 modification attempt was invalid.

The Court respectfully disagrees with Defendant's first argument while acknowledging the somewhat unsettled nature of the issue.  As noted, Defendant specifically argues that "the Terms of Use Agreement that went into effect [on] February 2, 2023 . . . apply to [Plaintiff's] claims."  (Doc. 18 at 6 n.1.)  However, to compel arbitration pursuant to the February 2023 Arbitration Agreement, the Court would first need to determine that this contract was validly formed.  Such a question cannot be delegated to the arbitrator.  *Caremark*, 43 F.4th at 1030 ("[A] court must resolve any challenge that an agreement to arbitrate was never formed, even in the presence of a delegation clause.").

In a related vein, whether the February 2023 Arbitration Agreement superseded the April 2016 Arbitration Agreement is not a "gateway" question subject to delegation.  The "gateway questions of arbitrability" are (1) "whether the agreement covers a particular controversy" and (2) "whether the arbitration provision is enforceable at all."  *Id.* at 1029.  Thus, if Plaintiff were asking the Court to find that her claim falls outside the scope of the February 2023 Arbitration Agreement or that the February 2023 Arbitration Agreement is procedurally or substantively unconscionable under Arizona law, such inquiries would need to be resolved by the arbitrator in light of the delegation clause.  But the disputed issue here is different.  Whether the February 2023 modification attempt was valid, such

that the February 2023 Arbitration Agreement supersedes the April 2016 Arbitration Agreement, is effectively a "contract-*formation* issue[]," and such issues are "always matters for judicial resolution." *Id.* at 1030.

In *Suski v. Coinbase, Inc.*, 55 F.4th 1227 (9th Cir. 2022), the Ninth Circuit confronted an analogous, albeit not identical, issue. There, the parties entered into a contract with an arbitration provision that contained a delegation clause and later entered into a separate contract with a forum-selection clause requiring all disputes to be brought in California. *Id.* at 1228-29. The plaintiffs then sued the defendant in California and the defendant moved to compel arbitration. *Id.* In opposing the arbitration demand, the plaintiffs argued that the later contract superseded the earlier contract. *Id.* In response, the defendant argued that "the issue of any superseding effect of the" later contract "concerns the scope of the arbitration clause and therefore falls within the [earlier contract's] delegation clause," but the district court rejected this argument and the Ninth Circuit affirmed, holding that "the existence rather than the scope of an arbitration agreement is at issue here" because "[t]he 'scope' of an arbitration clause concerns how widely it applies, not whether it has been superseded by a subsequent agreement." *Id.* at 1229-30. Afterward, the Supreme Court granted certiorari "to answer the question of who—a judge or an arbitrator—should decide whether a subsequent contract supersedes an earlier arbitration agreement that contains a delegation clause." *Coinbase, Inc. v. Suski*, 144 S. Ct. 1186, 1192 (2024). The Court affirmed the Ninth Circuit's "bottom-line conclusion" that a judge must decide this question, holding along the way that "before [a] delegation provision . . . can be enforced, a court needs to decide . . . which contract controls." *Id.* at 1191, 1193.

These principles are instructive here. Effectively, Defendant argues that once parties form an arbitration agreement that contains a delegation clause, any dispute over whether that agreement was later modified or superseded is a gateway question that has been delegated to the arbitrator. But this approach ignores that "[t]he 'scope' of an arbitration clause concerns how widely it applies, not whether it has been superseded by a

subsequent agreement," *Suski*, 55 F.4th at 1129-30, and would violate the rule that "before [a] delegation provision . . . can be enforced, a court needs to decide . . . which contract controls." *Coinbase, Inc.,* 144 S. Ct. at 1191.

Although there do not appear to be many cases involving this precise issue, the recent decision in *Picha v. Gemini Trust Co., LLC*, 2024 WL 967182 (S.D.N.Y. 2024), also supports the conclusion that the delegation clause in the April 2016 Arbitration Agreement does not preclude the Court from determining whether that version of the arbitration agreement was later superseded by the February 2023 Arbitration Agreement.  In *Picha*, the plaintiffs and Gemini entered into an arbitration agreement in September 2022 that contained a delegation clause.  *Id.* at *3.  A few months later, in December 2022, Gemini attempted to modify the arbitration agreement by, *inter alia*, extending the class action waiver's applicability to certain third parties.  *Id.* at *4.  Later, after the plaintiffs brought a class action against Gemini and two individual defendants, the defendants moved to compel arbitration pursuant to the December 2022 version of the arbitration agreement.  *Id.* at *7.  The plaintiffs, in turn, did not dispute that there was an arbitration agreement "in effect before the December . . . 2022 modification" but argued that the "defendants have not shown they accepted the agreement modifications."  *Id.*  Thus, "[t]he essence of the dispute between the parties [was] whether Gemini's actions and efforts to modify the [arbitration agreement] . . . were effective as a matter of law."  *Id.*  Notably, in resolving this dispute, the district court did not hold—as Defendant urges the Court to hold here— that the question of contract modification should be delegated to the arbitrator pursuant to the delegation clause in the earlier version of the arbitration agreement.  Instead, the court proceeded to perform a merits analysis of whether the modification was effective under the applicable state law.  *Id.* at *8-11.

The three supposedly contrary cases cited by Defendant during oral argument— *Williams-Diggins v. Experian Information Solutions, Inc.*, 2024 WL 3508671 (N.D. Ohio 2024), *Smith v. Experian Information Solutions, Inc.*, 2023 WL 6057377 (D.N.J. 2023), and *Kisciras v. Experian Information Solutions, Inc.*, 2024 WL 1713704 (D.N.J. 2024)—

do not compel a different conclusion.  In each case, the plaintiff enrolled in a CreditWorks account, which required that he or she assent to a terms of use agreement that included an agreement to arbitrate containing both a delegation clause and the same FCRA carveout as in the April 2016 Arbitration Agreement.  In each case, the parties did not dispute that the plaintiff had assented to the original terms of use agreement when registering for the CreditWorks account.  And in each case, the arbitration agreement was subsequently modified to remove the FCRA carveout.

In *Williams-Diggins*, the defendant did not argue that the validity of the modification attempt was a gateway issue that had been delegated to the arbitrator.  To the contrary, the defendant apparently asked the district court to find that the modification attempt was valid.  *Williams-Diggins*, 2024 WL 3508671 at *2 ("Experian first argues the parties formed a valid arbitration agreement when Williams-Diggins enrolled in CreditWorks and agreed to the Original Terms, *and that the agreement was affirmed when Williams-Diggins continued to use CreditWorks after the adoption of the Amended Terms*.") (emphasis added).  The plaintiff, in turn, did not dispute the validity of the modification attempt.  *Id.* ("Williams-Diggins does not dispute the validity or applicability of the . . . Amended Terms . . . .").  It is unclear why Defendant views this case as supporting its position here.

In contrast, *Smith* does, at first blush, support Defendant's position.  There, the district court declined to address the merits of the plaintiff's argument that "he agreed only to the Original Terms of Use, which carves out FCRA claims from the arbitration clause," on the ground that "whether the [modified] arbitration clause applies to FCRA claims is an issue of scope," which is an issue "for the arbitrator where, as here, there is a valid delegation clause."  *Smith*, 2023 WL 6057377 at *3.  Nevertheless, the Court respectfully disagrees with this approach for the reasons stated in earlier portions of this order.  Although identifying which version of the arbitration agreement is applicable may be outcome-determinative when it comes time for the arbitrator to decide the delegated issue of scope (*i.e.*, whether Plaintiff's claim falls within the scope of the applicable agreement),

it is not in itself a dispute *over* scope—instead, it is a dispute over whether an earlier version of a contract has been superseded by a later version. That issue is best conceptualized as a non-delegable question of contract formation. *Suski*, 55 F.4th at 1229-30 (explaining that "[t]he 'scope' of an arbitration clause concerns how widely it applies, not whether it has been superseded by a subsequent agreement").[11]

Finally, *Kisciras* is distinguishable for the same reasons as *Smith*. There, the plaintiff himself characterized his dispute over the validity of the modification attempt as "a factual dispute" over "the appropriate scope of the Arbitration Agreement." *Kisciras*, 2024 WL 1713704 at *2. The district court, in turn, cited *Smith* in support of its conclusion that any dispute over "which competing version of the Terms of Use governs" was a "question[] of scope and arbitrability. . . reserved for an arbitrator." *Id.* at *3. But as discussed, the Court views such a dispute as raising a question of contract formation/supersession, not a question of scope.

Nor is Defendant aided by its reliance on *Meeks v. Experian Information Services, Inc.*, 2022 WL 17958634 (9th Cir. 2022), and *Rent-A-Center, West, Inc. v. Jackson*, 561 U.S. 63 (2010). *Meeks* did not involve multiple versions of an arbitration agreement with modifications. There, the Ninth Circuit simply "reverse[d] the district court's denial of Experian's initial motion to compel arbitration" because the district court concluded that Experian was not a party to the arbitration agreement by referring to the definition of

---

[11]     *Smith* cited *Field Intelligence Inc v. Xylem Dewatering Solutions Inc*, 49 F.4th 351 (3d Cir. 2022), in support of its conclusion that the contract-modification issue was a gateway question of scope that had to be resolved by the arbitrator. *Smith*, 2023 WL 6057377 at *3 n.3 ("The Third Circuit has held that a court should decide the issue of whether a second contract has superseded the first before compelling arbitration, but this is only when such a decision would lead to a determination that absolutely no valid arbitration agreement exists, as opposed to a decision that would anyway result in referring a case to arbitration for a determination of scope."). The Court respectfully does not share the same interpretation of *Field Intelligence*, as that decision does not hold that district courts can only resolve the issue of contract supersession when the later version purports to remove the arbitration provision in the earlier version (even though those happened to be the facts of *Field Intelligence*). *Field Intelligence* also broadly recognizes—consistent with the conclusions reached here—that any "distinction" between "contract formation" and "contract supersession" "deserves little weight in this context" because "[l]ike a formation dispute, [a] supersession challenge places the parties' mutual assent directly at issue." *Field Intelligence*, 49 F.4th at 357-58.

"ECS" in the larger agreement while "[i]gnoring the arbitration provision's definition of ECS." *Id.* at *2. The Ninth Circuit explained that because the arbitration agreement was severable from the larger agreement, "the district court should have determined whether Experian is a party to the arbitration provision itself and done so under that provision's broader definition of ECS." *Id.* at *1-2. The issue here—whether an arbitrator or the Court decides which version of the arbitration agreement controls—is quite different from the severability issue in *Meeks*. Meanwhile, although *Rent-A-Center* "held that a challenge to the validity of an entire arbitration agreement—there, an unconscionability challenge—must be decided by the arbitrator if the agreement includes a delegation clause that is not directly challenged," "the issues reserved to the courts for decision 'always include' whether an arbitration agreement was formed, even in the presence of a delegation clause." *Caremark*, 43 F.4th at 1029-30 (citations omitted). Here, as discussed, the dispute over the applicability of the February 2023 Arbitration Agreement is best conceptualized as a non-delegable contract formation/supersession issue, not a delegable validity challenge akin to an unconscionability challenge.

For these reasons, to the extent Defendant seeks to compel arbitration pursuant to the February 2023 Arbitration Agreement, the Court must decide whether the modification attempt was valid under Arizona law—an issue that, unfortunately, was the subject of almost no attention in the parties' briefing.

## 2. Modification

As discussed, state law governs whether an agreement to arbitrate exists. *Mundi*, 555 F.3d at 1044; *Davis*, 755 F.3d at 1093. Arizona has adopted the requirements for contract modification set forth in the Restatement On Consumer Contracts § 3 (Am. L. Inst., Tentative Draft No. 2, 2022). *Cornell v. Desert Fin. Credit Union*, 524 P.3d 1133, 1139 (Ariz. 2023). That provision, in full, provides as follows:

> (a)   A modification proposed by the business of a standard contract term in a consumer contract governing an ongoing relationship is adopted if the business demonstrates that:

(1)    the consumer received reasonable notice of the proposed modified term and a reasonable opportunity to review it;

(2)    the consumer received a reasonable opportunity, including reasonable notice of the opportunity, to reject the proposed modified term and continue the contractual relationship under the existing term, and;

(3)    the consumer received reasonable notice that continuing the contractual relationship without rejecting the proposed modified term will result in the modification being adopted; and

(4)    the consumer either:

    (A)    manifested assent to the modified term, or

    (B)    did not reject the proposed modified term and continued to take the benefit of the contractual relationship after the expiration of the rejection period provided in the proposal.

(b)    A consumer contract governing an ongoing relationship may provide for a reasonable procedure for adoption of modified terms under which the business may propose a modification of the standard contract terms but may not, to the detriment of the consumer, exclude the application of subsection (a), except that the established procedure may replace the reasonable opportunity to reject the proposed modified term with a reasonable opportunity to terminate the transaction without unreasonable cost, loss of value, or personal burden.

(c)    A modification by the business of a standard contract term in a consumer contract is adopted only if the modification is proposed in good faith, if it is fair and equitable, and if it does not have the effect of undermining an affirmation or promise made by the business that was made part of the basis of the original bargain between the business and the consumer.

(d)    Standard contract terms may not be modified in a consumer contract that has been substantially performed by at least one party.

Restatement On Consumer Contracts § 3 (Am. L. Inst., Tentative Draft No. 2, 2022).

When Plaintiff created her CreditWorks account in 2017, the April 2016 Terms of

Use was the operative agreement.  (Doc. 18-1 ¶ 5; Doc. 18-4.)  Although Defendant never uses the word "modification" in its briefing, Defendant argues that the February 2023 Terms of Use apply to Plaintiff's claim because "[e]very version of the Terms of Use Agreement in effect during Plaintiff's enrollment has a section entitled, 'Amendments,' which advised her that she would be bound by the then-current Terms of Use each time she 'ordered, accessed, or used' any of the Services or Websites described in the agreement." (Doc. 18 at 7, cleaned up.)  Defendant submits unrebutted evidence that Plaintiff last logged into CreditWorks on May 21, 2023 (Doc. 18-1 ¶ 5), and Plaintiff acknowledges that she had an Experian account for six years (Doc. 19 at 13), which is consistent with a final log-in date in May 2023.  At the time of Plaintiff's last login, the April 2023 Terms of Use were in effect.  (Doc. 18 at 6 n.1; Doc. 18-1 at 3 n.1.)  However, Defendant notes that the April 2023 Terms of Use include a provision notifying customers that if they cancel their accounts on or before June 1, 2023, the February 2023 Terms of Use will apply to any future dispute.  (Doc. 18 at 6 n.1.)  Defendant contends that because Plaintiff cancelled her account on May 22, 2023, the February 2023 Terms of Use "apply to her claims."  (*Id.* at 6 & n.1.)

### a.  **Modification Under § 3(a)**

The Arizona Supreme Court summarized the requirements of § 3(a) as follows: "[B]usinesses may effectively modify the non-negotiated, standardized terms governing [on-going, at-will, consumer-business] relationships if the business demonstrates that (1) the contract's initial terms expressly notified the consumer that the business could make future changes to the terms; (2) the business gave—and the consumer received— reasonable notice of the modification and an opportunity to opt out with no change to the status quo business relationship; and (3) the consumer continued the business relationship past a reasonable opt-out period."  *Cornell*, 524 P.3d at 1135.

### i.  Express Notice Of Possible Future Modifications

The first requirement for a valid consumer contract modification under § 3(a) is that "the contract's initial terms expressly notified the consumer that the business could make

future changes to the terms." *Cornell*, 524 P.3d at 1135.  Here, the initial terms are the April 2016 Terms of Use.  The April 2016 Terms of Use provide express notice that the agreement is subject to change: "This Agreement may be updated from time to time. . . . Each time you order, access or use any of the Services or Websites, you signify your acceptance and agreement, without limitation or qualification, to be bound by the then current Agreement." (Doc. 18-4 at 2.)  This, alone, is sufficient to provide express notice of the possibility of future changes.  *Cornell v. Desert Fin. Credit Union*, 684 F. Supp. 3d 958, 967 (D. Ariz. 2023).

                    ii.    <u>Reasonable Notice Of The Modification And Of Opt-Out Rights And Consequences</u>

The second requirement for a valid consumer contract modification under § 3(a) is that "the business gave—and the consumer received—reasonable notice of the modification and an opportunity to opt out with no change to the status quo business relationship." *Cornell*, 524 P.3d at 1135.  "Modification clauses that grant the business power to modify standard terms without meeting the mandatory requirements of [§ 3 of the Restatement] are ineffective, and any modification attempted under such clauses is unenforceable by the business."  Restatement § 3, cmt. 6.

The first part of the "reasonable notice" requirement involves notice of the actual modification.  The starting point for evaluating reasonableness in this context is comment 1 to the Restatement § 3, which explains that "the process of adoption of a modification must satisfy requirements of assent analogous to those in § 2."  *Id.*  Comment 2 to the Restatement § 2, in turn, explains that reasonableness is a "totality of the circumstances" inquiry that "requires a case-by-case, fact-intensive analysis in light of the ordinary behavior and perspective of consumers engaged in the type of transaction at issue and their interaction with the business."  *Id.*  Some of the suggested factors to consider are "the form and nature of the transaction; the clarity, sequence, flow, and simplicity of the communication of the terms; the design, layout, and content of the interface; the nature of the transaction; the totality of the consumer's interactions with the business; the difficulty

of identifying the notices and finding the location of the terms; the prominence of notices regarding important terms and their nature; and the visibility and clarity of the language alerting consumers that specific steps will result in the adoption of the terms as part of the contract with the business, as well as the manner in which the consumer is asked to manifest assent to the transaction and acknowledge the adoption of the standard contract terms." *Id.* *See also* Restatement § 3 cmt. 3 (referencing § 2 cmt. 2).

The April 2016 Terms of Use include the following language in the section entitled "Amendments": "You should check this Website regularly for updates to this Agreement. Each time you order, access or use any of the Services or Websites, you signify your acceptance and agreement, without limitation or qualification, to be bound by the then current Agreement.  Modifications take effect as soon as they are posted to this Website (or any of the Websites, to the extent applicable to you), delivered to you, or reasonably made available to you in writing by ECS."  (Doc. 18-4 at 2.)

The first method of notice described in the Amendments section of the April 2016 Terms of Use (*i.e.*, simply posting the revised terms on ECS's website) fails to satisfy § 3(a)'s "reasonable notice" requirement.  *See* Restatement § 3, Illustration 5 ("The business later posts a modified version of the Terms and Conditions on its website, revising the heading in the page on which the terms are posted and entitling it 'Revised Terms and Conditions.'  If the business does not provide the consumer with a distinct or separate notice of the modification, describing specific changes to the agreement and the effective date of those changes, the new terms are not adopted as a binding modification.  It is not reasonable to expect consumers to revisit and check the Terms and Conditions web page regularly, and, in the absence of an affirmative, reasonable alert, the consumer does not have a reasonable opportunity to review the proposed modification as required by subsection (a)(1).").[12]

---

[12]    During oral argument, Defendant argued that in *Cornell v. Desert Financial Credit Union*, 524 P.3d 1133 (Ariz. 2023), the Arizona Supreme Court only adopted the Restatement, but not the illustrations in the Restatement, and therefore the Court should not rely on those illustrations in its analysis.  This argument is unavailing.  As an initial matter, in *Cornell*, the Arizona Supreme Court did not say that it was declining to adopt the illustrations to the Restatement.  To the contrary, the Court "adopt[ed] the Restatement

This leaves the remaining methods of notice described in the Amendments section of the April 2016 Terms of Use (*i.e.*, delivering the revised terms to Plaintiff or otherwise making them available in writing to Plaintiff).   An initial problem with Defendant's showing as to these methods is that there is no evidence that ECS ever sent a copy of the February 2023 Terms of Use or the April 2023 Terms of Use to Plaintiff.   Nevertheless, even assuming such copies were sent—the April 2023 Terms of Use include the assertion that "[a] copy of *this Agreement* also is being e-mailed to you at the e-mail address currently on file with your membership" (Doc. 18-6 at 5, emphasis added)—there is no evidence that ECS provided distinct notice to Plaintiff as to how the new version differed from the previous version.   And as discussed above, Illustration 5 to § 3 explains that "[i]f the business does not provide the consumer with a distinct or separate notice of the modification, describing specific changes to the agreement and the effective date of those changes, the new terms are not adopted as a binding modification."   Likewise, Illustration 7 to § 3 explains that when a revised version of an account agreement is sent to a consumer but "[t]here is no explanation or indication as to which terms are being changed," "[t]he presentation of the proposed modification in this manner does not satisfy the reasonable

---

of Consumer Contracts § 3 . . . to the extent [a previous decision] does not provide for this result."   *Cornell*, 524 P.3d at 1135.   Under Arizona law, this is evidence the Court also intended to adopt the accompanying comments and illustrations.   *Cao v. PFP Dorsey Invs., LLC*, 545 P.3d 459, 466 (Ariz. 2024) ("When a statute is based on a uniform act, we assume that the legislature intended to adopt the construction placed on the act by its drafters. Commentary to such a uniform act is highly persuasive unless erroneous or contrary to the settled policy of Arizona.") (cleaned up).   *Cf. Koss Corp. v. Am. Express Co.*, 309 P.3d 898, 904 n.7 (Ariz. Ct. App. 2013) ("While the comments to the U.C.C. were not adopted by the legislature as comments to the Arizona version of the U.C.C[.], we look to . . . the U.C.C. commentary for guidance because the relevant provisions of the state act mirror the U.C.C.").   At any rate, Defendant's theory as to why *Cornell* declined to adopt the illustrations in the Restatement is that *Cornell* included an approving citation to *Miracle-Pond v. Shutterfly, Inc.*, 2020 WL 2513099 (N.D. Ill. 2020), which endorsed an approach that is inconsistent with the illustrations.   But *Cornell* only cited *Miracle-Pond* in the portion of the opinion discussing the required notice of opt-out rights.   *Cornell*, 524 P.3d at 1140.   Putting aside the "enigmatic" nature of this citation as it applies to that issue, *see Cornell*, 684 F. Supp. 3d at 973 (concluding that the relevant standard for providing notice of opt-out rights was contained in "the unambiguous holding set forth in the text of *Cornell*" rather than in the "enigmatic" "'see also' citation to *Miracle-Pond*"), *Cornell* did not cite *Miracle-Pond* in the separate portions of the opinion addressing § 3(a)(1)'s requirement that "the consumer received reasonable notice of the proposed modified term," *Cornell*, 524 P.3d at 1139, which is the requirement at issue here.

- 38 -

notice requirement of subsection (a)(1), because consumers cannot readily compare and analyze two such lengthy and technical documents and thus cannot effectively review the proposed modification."

For these reasons, Defendant has failed to meet its burden of establishing that it provided "reasonable notice of the modification" in relation to the February 2023 Arbitration Agreement.  Given this conclusion, it is unnecessary to address whether Defendant can also satisfy the "reasonable notice of opt-out rights and consequences" portion of § 3(a).

### iii.    Continuation Of The Business Relationship

The final requirement for a valid consumer contract modification under § 3(a) is that "the consumer continued the business relationship past a reasonable opt-out period." *Cornell*, 524 P.3d at 1135.  Given the conclusion in the preceding section, it is unnecessary to address whether Defendant can also satisfy this requirement.

### b.    **Modification Under § 3(b)**

Section 3(b) creates an alternative modification process for companies that do not want to be forced to continue their contractual relationships with customers who would prefer to opt out of future modifications, as § 3(a) would ordinarily enable customers to do. Under § 3(b), such companies are authorized, at least under certain circumstances, to create a modification process that replaces customers' usual opt-out right with a termination option.  "Businesses must expressly reserve this termination power in the agreement's initial terms, and they may exercise it only if termination will not cause unreasonable cost, loss of value, or personal burden."  *Cornell*, 524 P.3d at 1139 n.2 (cleaned up).

As discussed above, the April 2016 Arbitration Agreement contains language informing customers of their ability to opt out of modifications.  The only termination language is found in the April 2023 Terms of Use.  Accordingly, Defendant did not purport to adopt a modification procedure that would eliminate customers' opt-out rights in the initial terms, as § 3(b) potentially authorizes.[13]

---

[13]    In light of the determinations with respect to §§ 3(a) and (b) set forth above, it is

- 39 -

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

        3.      <u>Conclusion As To February 2023 Terms Of Use</u>

Defendant has failed to meet its burden of establishing that its modification attempt was valid under § 3(a) or § 3(b).  Thus, Plaintiff is not bound by the February 2023 Arbitration Agreement.

        F.    **Conclusion**

As noted, Defendant's alternative objection to the conclusion in the tentative ruling (*i.e.*, that the motion to compel arbitration should be denied because Defendant is only seeking to compel arbitration pursuant to the February 2023 Arbitration Agreement) is that the Court should, at a minimum, compel arbitration pursuant to the April 2016 Arbitration Agreement.

Having re-reviewed the parties' briefing, the Court is satisfied that Defendant did enough in its motion papers to advance this argument.  Additionally, even though the carveout for FCRA claims that appears in the April 2016 Arbitration Agreement raises questions about whether Plaintiff's claim falls within the scope of that agreement, the delegation clause in the April 2016 Arbitration Agreement means this question must be decided in the first instance by the arbitrator.  *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 586 U.S. 63, 68 (2019) ("When the parties' contract delegates the arbitrability question to an arbitrator, a court may not override the contract.  In those circumstances, a court possesses no power to decide the arbitrability issue.  That is true even if the court thinks that the argument that the arbitration agreement applies to a particular dispute is wholly groundless.").

III.    <u>Stay</u>

Under the FAA, "[i]f any suit or proceeding be brought in any of the courts of the United States upon any issue referable to arbitration under an agreement in writing for such arbitration, the court in which such suit is pending, upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration under such an agreement, shall on application of one of the parties stay the trial of the action until such arbitration

---

unnecessary to address the question of bad faith under § 3(c).

1   has been had in accordance with the terms of the agreement, providing the applicant for

2   the stay is not in default in proceeding with such arbitration." 9 U.S.C. § 3. Thus, "[w]hen

3   a federal court finds that a dispute is subject to arbitration, and a party has requested a stay

4   of the court proceeding pending arbitration, the court does not have discretion to dismiss

5   the suit on the basis that all the claims are subject to arbitration." *Smith v. Spizzirri*, 601

6   U.S. 472, 475-76 (2024).

7        Defendant argues that "[b]ecause Plaintiff must be compelled to arbitrate her claim,

8   the action as to [Defendant] should be stayed pending completion of arbitration." (Doc. 18

9   at 16.) Plaintiff does not respond to Defendant's request for a stay, and *Smith* compels the

10  Court to grant that request regardless of whether it is opposed.

11       Accordingly,

12       **IT IS ORDERED** that:

13       1.    Defendant's motion to compel arbitration (Doc. 18) is **granted**, but only

14  insofar as it seeks to compel arbitration pursuant to the April 2016 Arbitration Agreement.

15       2.    This action is **stayed** pending resolution of the arbitration proceeding.

16       3.    The parties shall file a joint notice every six months concerning the status of

17  the arbitration proceeding (with the first report due six months from today).

18       Dated this 20th day of August, 2024.

19

20

21                                      _____

22                                      Dominic W. Lanza
                                        United States District Judge
23

24

25

26

27

28